United States District Court

DISTRICT OF ____CONNECTICUT____

October 9, 08
Mary E Larsen

UNITED STATES OF AMERICA

V.

STEVEN MONTALVO

CRIMINAL COMPLAINT

CASE NUMBER: 3:08mj 210 (EBB)

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. On September 30, 2008, in Fairfield County, in the District of Connecticut, the defendant did,

use the telephone, to willfully make threats to kill and injure individuals employed by the HSBC Bank branch at 101 Broad Street, Stamford, Connecticut

in violation of Title __18__ United States Code, Section(s) __844(e)__ I further state that I am a(n) Sargent with the Joint Terrorism Task Force and that this complaint is based on the following facts:

See attached affidavit of Sgt. Duncan Stewart

Continued on the attached sheet and made a part hereof.    X  Yes ___ No

_____
Signature of Complainant
Duncan Stewart, Sargent
Joint Terrorism Task Force

Sworn to before me, and subscribed in my presence

October 9, 2008
**Date**

at New Haven, Connecticut
**City and State**

ELLEN B. BURNS, U.S. DISTRICT JUDGE
**Name and Title of Judicial Officer**

_____
**Signature of Judicial Officer**

STATE OF CONNECTICUT              :

                                  :       ss: CITY OF NEW HAVEN  October 9, 2008

COUNTY OF NEW HAVEN               :

## AFFIDAVIT

Duncan Stewart, being duly sworn, deposes and states the following:

1. I am a Task Force Agent assigned to the Connecticut Joint Terrorism Task Force ("JTTF"), and have served on the JTTF for approximately one year. For 24 years, through and including the present, I have also served as a full time member of the Stamford, Connecticut Police Department ("SPD"). I presently have the rank of Sergeant, and am assigned to the SPD Detective Bureau. I have investigated numerous criminal offenses under both state and federal criminal law, including but not limited to narcotics offenses, organized crime, and homicides. I have served as an affiant for substantially in excess of 100 search and seizure warrants, and I have participated in the execution of hundreds of search and arrest warrants.

2. I make this Affidavit in support of a criminal complaint and arrest warrant for STEPHEN MONTALVO, of Stamford, Connecticut, and for a warrant to search (1) STEPHEN MONTALVO's residence located at 1450 Washington Blvd., Apt. 307S, Stamford, Connecticut, and (2) one 2005, 4-door Cadillac Sedan CTS, white in color, Connecticut Plate 740WRS, VIN #1G6DP567650195966, registered to STEPHEN MONTALVO, both more particularly described on Attachment A, for evidence, fruits, and instrumentalities of the violation of federal law described herein, as more particularly described in Attachment B.

3. The statements contained in this Affidavit are based upon my training and experience, my observations and personal knowledge, and information provided by other law enforcement personnel. Because this Affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of a complaint, an arrest warrant, and a search warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth

herein only those facts that I believe are necessary to establish that probable cause exists to support the issuance of the complaint and the warrants.

4. Based on the facts set forth herein, I submit there is probable cause to believe, and I do believe, that STEPHEN MONTALVO has committed a violation of 18 U.S.C. § 844(e) (~~bomb~~ threats), and that evidence, fruits, and instrumentalities of that violation of federal law are located at the premises of 1450 Washington Blvd., Apt. 307S, Stamford, Connecticut, and in the premises of STEVEN MONTALVO's 2005, 4-door Cadillac Sedan CTS, white in color, Connecticut Plate 740WRS, VIN #1G6DP567650195966, both as more particularly describe in Attachment A. In support thereof, I submit as follows.

Factual Narrative

5. On October 4, 2008, an officer of the Stamford Police Department ("SPD") responded to a Chase Bank branch located at 45 Prospect Street in Stamford, Connecticut, based upon a report of a previous threat incident that occurred on September 30, 2008. At the Chase Bank branch, the officer interviewed a cooperating witness employed by the bank ("CW-1"), who reported the following. On the afternoon of Tuesday, September 30, 2008, at about 4:30 p.m., CW-1 received a voice message in his/her cell phone. Later that day CW-1 listened to the message, which CW-1 recognized as STEPHEN MONTALVO, and which message began with the caller identifying himself as "Steve." In the recorded message, STEPHEN MONTALVO referred to the employees of a nearby HSBC Bank branch, located at 101 Broad Street in Stamford, stating that he would take a gun into the HSBC bank and would do whatever he had to do to get his money. CW-1 knew from prior encounters with STEPHEN MONTALVO that STEPHEN MONTALVO was angry with HSBC after having lost money on certain investments. The responding officer listened to the phone message on CW-1's cell phone, and verified that the threat described by CW-1 had been made, and

that the date/time stamp of the phone call was for Tuesday, September 30, 2008, at approximately 4:30 p.m.

6. CW-1 and another employee of the same Chase Bank branch, CW-2, both advised the responding officer that STEPHEN MONTALVO had come to the bank branch on one or more other occasions and conveyed his intent to harm the employees of HSBC. On September 30, 2008, STEPHEN MONTALVO had come to the Chase Bank branch prior to 4:30 p.m., and spoke with CW-1. During that conversation, STEPHEN MONTALVO stated that he intended to bomb the HSBC Bank branch in Stamford.

7. Almost six weeks before the phone threats reported above, on or about August 21, 2008, officers of the Stamford Police Department responded to the HSBC Bank branch at 101 Broad Street, Stamford, based on a report of a problem with bank personnel. The officers spoke with STEPHEN MONTALVO, who met them outside the bank. STEPHEN MONTALVO initially alleged that the bank had stolen $500,000 from him, but in response to questioning, alleged instead that the bank had made investments that he had told them not to make. He further stated that the bank had transferred some of his funds to another institution at his request, but that the bank was refusing to given him the remaining funds that he believed had been stolen from his account. Asked about an open, bleeding laceration on his hand, STEPHEN MONTALVO stated that he had slammed his hand down on something when the bank manager refused to listen to him, and he declined an offer of medical treatment. The officers described STEPHEN MONTALVO's conduct as "extremely agitated," and reported that he refused to listen the officers, and that he continually interrupted them. The officers later interviewed the manager of the HSBC Bank branch, who verified that STEPHEN MONTALVO had an account with their bank. The branch manager stated that STEPHEN MONTALVO had come to the branch on several prior occasions complaining about

his investments, which the bank personnel had attempted to help him with. STEPHEN MONTALVO had requested that the bank transfer his funds to another institution, and as of August 21, 2008, as the branch manager had explained to STEPHEN MONTALVO, about half had been transferred, and the transfer of the other half would be completed in approximately one week. On that date, however, STEPHEN MONTALVO had entered the branch, had commenced yelling that his money had been stolen by the bank, and had demanded the names and business cards for everyone involved, whereupon the branch manager requested that he leave the premises owing to his disruptive behavior.

8. On October 4, 2008, CW-1 had reported to the responding officer at Chase Bank that STEPHEN MONTALVO's car displayed signs with negative messages about HSBC. Information from the Connecticut Department of Motor Vehicles confirms that STEPHEN MONTALVO is the registered owner of one 2005, 4-door Cadillac Sedan CTS, white in color, Connecticut Plate 740WRS, VIN #1G6DP567650195966. On October 7, 2008, officers of the Stamford Police Department personally observed STEPHEN MONTALVO's Cadillac Sedan CTS parked in the garage of the building where he resides, and saw attached to it, a number of large, professionally printed placards referring to HSBC. Three of the placards stated the following, respectively:

> I met the devil from HSBC who calls himself a "financial advisor" who lost me a lot of money in three months.
>
> I had to give up my long term health care because of HSBC's advice. Now I cannot afford to keep my health care.
>
> If you believe in Santa Clause then don't believe in HSBC financial advisors because a 5th grader can give better advice.

9. On October 6, 2008, an arrest warrant was issued for STEPHEN MONTALVO by the Stamford Superior Court, based on affidavit and an Information charging him with First Degree Threatening, under C.G.S. § 53a-61aa, and Act of Terrorism, under C.G.S. § 53a-300. On the morning of October 7, 2008, I participated in the execution of the arrest warrant at STEPHEN MONTALVO's residence, located at 1450 Washington Blvd., Apt. 307S in Stamford. Later that morning, afer he had been brought into custody at the Stamford Police Department, STEPHEN MONTALVO made repeated, spontaneous statements regarding the employees at HSBC Bank, including, "I want to kill all those f***ing people at the bank," and "I wish all the people at the bank were all dead."

### Probable Cause to Believe that STEPHEN MONTALVO has Retained Instrumentalities and/or Evidence of the Threat Crime

10. I know from my own training and experience, and from the experience of other law enforcement officers with whom I have discussed the patterns and practices of criminal offenders, that many criminal offenders create, obtain, and preserve instrumentalities of their crimes and evidence and records pertaining to those crimes. In addition to the materials and equipment for carrying out the crimes, the evidence and records retained by perpetrators can include, among other things: information for carrying out crimes, including locations, addresses, and telephone numbers of locations/targets and intended locations/targets of criminal activity, as well as notes, instructions, and research pertaining to methods of committing particular crimes; financial records and documentation pertaining to crimes and the procurement of materials and equipment for carrying out the crimes; and with respect to crimes that receive media attention, news clippings and other media reports of crimes carried out by the offender, as well as news reports of similar crimes carried out by others.

11. I believe it is particularly likely that materials, equipment, and evidence and records of efforts to carry out the threats in question exist at STEVEN MONTALVO's residence, and in his Cadillac Sedan CTS, for reasons that include the following: (1) the evidence indicates that STEPHEN MONTALVO's anger at the targets of his threats, and hence his motive to carry out the threats, has been steadily escalating, insofar his actions have evolved from first accusing HSBC's employees of stealing his funds, to complaining to Chase Bank personnel about HSBC's employees and conveying an intent to harm them, then speaking and telephoning lethal threats about HSBC employees to CW-1 at Chase Bank, and following his arrest, repeatedly insisting that "I want to kill all those f***ing people at the bank," and "I wish all the people at the bank were all dead"; (2) the evidence indicates that STEPHEN MONTALVO has become obsessively fixated upon HSBC for, in his mind, having deliberately wronged him – characterizing one of its employees as "the devil" in a large, professionally-printed placard attached to his Cadillac Sedan CTS – and that he has failed to satisfy his grievances against HSBC despite his escalating expressions of rage against it; and (3) the evidence indicates that STEPHEN MONTALVO's escalating rage is combined with a strong drive to make a public spectacle of his grievance against HSBC.

12. In addition to objects and materials that could be used to carry out the threats indicated herein, the kinds of evidence discussed above may be kept in and on several types of media, including but not limited to: handwritten, typed, printed, photocopied, or any other "hard copy" format; audio and/or video recordings, including but not limited to, audio cassettes, reel-to-reel tapes, telephone answering machines, cell phones, VCR tapes, video cameras, CDs/DVDs, and/or computer or other electronic storage files; and electronic media, including but not limited to text, e-mail, instant-message, photograph, audio, and video formats, and including but not limited to

storage methods consisting of or involving cell phones, video cameras, computer hard drives, thumb drives, floppy discs, CD/DVDs, or e-mail and/or instant message files.

13. During my participation in the arrest of STEPHEN MONTALVO on October 7, 2008, the observations by the arrest team were limited to the scope of a protective sweep for weapons, and did not extend to such locations as closed drawers or containers. Weapons were not discovered during that limited search, and no computer was observed in plain view. However, owing to the limited nature of the search that was conducted, the possible presence of secreted weapons or computer(s) and computer media cannot be ruled out.

### Conclusion

14. Based upon the foregoing, I submit that there is probable cause to believe, and I do believe, that on September 30, 2008, STEPHEN MONTALVO, through the use of the telephone, willfully made a threat concerning an attempt to kill and injure individuals employed by the HSBC Bank branch at 101 Broad Street, Stamford, in violation of 18 U.S.C. § 844(e).

15. Based on the foregoing, I further submit that there is probable cause to believe, and I do believe, that evidence, fruits, and instrumentalities of the foregoing crime is located on the premises of STEPHEN MONTALVO's residence, at 1450 Washington Blvd., Apt. 307S, Stamford, Connecticut, including any storage facilities in the building assigned to that apartment, and in the premises of STEVEN MONTALVO's 2005, 4-door Cadillac Sedan CTS, white in color, Connecticut Plate 740WRS, VIN #1G6DP567650195966, as more fully described in Attachment A to this Affidavit.

16. I therefore request that a complaint and an arrest warrant for STEPHEN MONTALVO be issued, and that search warrants for the two premises described in Attachment A to this Affidavit be issued, to search for and seize the items listed on Attachment B to this Affidavit.

## Execution of the Warrants as to Computer Systems and Storage Devices

17. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, and passwords which are (1) instrumentalities, fruits or evidence of a crime, or (2) storage devices for information about a crime. In the event that a computer or computer media of any kind are found during the search of the premises described in Attachment A, the following considerations and protocols will be observed.

18. Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I know that electronic data can be stored on a variety of computer systems and storage devices. I also know that during the search of the premises, it is rarely possible to complete an on-site examination (and in some cases even images) of computer systems and storage devices for a number of reasons, including the following:

a. Imaging and forensic analysis of computer systems and storage devices is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is rarely possible to bring to the location where the warrant is to be executed all of the necessary technical manuals and specialized equipment necessary to conduct a thorough analysis. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, operating system, or software application being analyzed.

b. The analysis of computer systems and storage devices often relies on rigorous procedures designed to maintain the integrity of the evidence and to recover "hidden," mislabeled, deceptively-named, erased, compressed, encrypted, or password-protected data, while reducing the

-8-

likelihood of inadvertent or intentional loss or modification of data. A controlled environment, such as a law enforcement laboratory, is typically required to conduct such an analysis properly.

  c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to analyze (or at times image) the data during the execution of the physical search of the premises. The hard drives commonly included in mere desktop computers are capable of storing millions of pages of text; the storage capacity of servers is often much greater.

  19. Due to the volume of data at issue and the technical requirements set forth above, it may be necessary for the above-referenced computer systems and storage devices to be seized and analyzed subsequently by a qualified computer specialist in a laboratory setting. Under certain circumstances, however, some types of computer systems and storage devices may be imaged and a copy of the data may be seized, thus eliminating the need for its removal from the premises. A determining factor is whether a particular device can be more readily, quickly, and thus less intrusively, analyzed off-site, with due consideration given to preserving the integrity of the evidence. This, in turn, is often dependent on the size of the computer systems and storage media to be analyzed; and this is frequently dependent upon the particular type of computer system or storage device involved.

  20. Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I am aware that forensic analysis of computer systems and storage devices taken from the premises commonly requires agents to seize most or all of a computer system and storage devices, in order for a qualified computer expert to retrieve the data accurately in a laboratory or other controlled environment. Therefore, in those instances where computer systems and storage devices are removed from the

premises, in order to retrieve data properly, the agents must seize all of the computer systems and storage devices. If, after imaging and inspecting the computer systems and storage devices, it becomes apparent that these items are no longer necessary to retrieve and preserve the data as evidence, and are not otherwise seizeable, such equipment and/or materials will be returned within a reasonable time.

21. Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I am aware that the analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying the file directories and any individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence authorized for seizure by the warrant); conducting a file-by-file review of the data; examining all the structured, unstructured, deleted, and free space data on a particular piece of media; opening or reading the first few pages of each file in order to determine their precise contents; scanning storage areas to discover and possibly recover deleted data; scanning storage areas for deliberately hidden files; and performing electronic key-word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation. The forensic analysis of the electronic information seized during the search can take weeks or months, depending on the volume of data stored in the computers.

## Request to Seal

22. I further request that this application and Affidavit for a Complaint, arrest warrant, and two search warrants, including attachments, be sealed, except insofar as needed to execute the requested arrest warrants and search warrants. This investigation is ongoing. Premature disclosure of the contents of this Affidavit could compromise the investigation by alerting the target of the investigation to the nature of the probe, the techniques employed, the evidence developed to date, and the evidence that continues to be pursued by law enforcement agents, and accordingly could result in the destruction or concealment of evidence material to the investigation.

DUNCAN STEWART
Task Force Agent
Connecticut Joint Terrorism Task Force

Subscribed and Sworn before me this 8 day of October, 2008 at New Haven, Connecticut.

HON. ELLEN BREE BURNS
UNITED STATES DISTRICT JUDGE

ATTACHMENT A
Premises to be Searched

1450 Washington Blvd., Apt. 307S, Stamford, Connecticut, including <u>any storage facilities in the building assigned to that apartment</u>

1450 Washington Blvd. is a 16-story red brick apartment building, located at the corner of Washington Blvd. and North Street in Stamford, Connecticut. Apartment 307S is located on the third floor of the building, and the entrance door to this apartment displays the number 307S.

<u>STEPHEN MONTALVO's 2005, 4-door Cadillac Sedan CTS</u>

STEPHEN MONTALVO's 2005, 4-door Cadillac Sedan CTS is an automobile, white in color, displaying Connecticut License Plate #740WRS, and bearing VIN #1G6DP567650195966. It is presently believed to be parked in the garage of the above-described residence.

<u>ATTACHMENT B</u>
Items to be Seized

1. Weapons, materials, notes, plans, research, and/or documentation of any kind concerning actual and potential threats to bomb, burn, shoot at/within, or otherwise attack/destroy/harm, any persons, public facilities, and/or occupants of same, including but not limited to:

    a. Weapons, ammunition, weapons components, parts, materials, and/or precursor chemicals used for making bombs and/or firearms, and/or any manuals, guides, and any other written, audio, or video material containing information and/or instructions about how to obtain, assemble, use, and/or conceal weapons, bombs, and/or incendiary devices

    b. Targets of threats, including but not limited to phone numbers, person(s), institutions(s), address(es), location(s), descriptions

    c. Methods of communicating/conveying threats

    d. Research and/or plans for communicating/conveying and/or carrying out any actual or contemplated threats, and for avoiding detection/arrest upon making or carrying out any such threats

    e. Notes and other documentation concerning the purported reasons for making such threats

    f. News reports, photographs, video clips, notes, and any other documentation reflecting the facts, impacts, and consequences of threats that have been made, whether by STEPHEN MONTALVO or by any other person(s)

2. Documents, notes, and/or any other materials concerning or related to STEPHEN MONTALVO's finances and investments at any time held by HSBC Bank or Chase Bank, including but not limited to information about the amounts of and changes in the nature and value of said investments.

<u>Format/media of items to be seized</u>: The foregoing materials may be stored in, and therefore may be seized from, among others, the following formats and/or repositories:

    1. Handwritten, typed, printed, photocopied, or any other "hard copy" format

    2. Audio and/or video recordings, including but not limited to, audio cassettes, reel-to-reel tapes, telephone answering machines, cell phones, VCR tapes, video cameras, CDs/DVDs, and/or computer or other electronic storage files

    3. Electronic media, including but not limited to formats of text, e-mail, instant-message, photograph, audio, and video formats, and including but not limited to storage methods consisting of or involving cell phones, video cameras, computer hard drives, thumb drives, floppy discs, CD/DVDs, or e-mail and/or instant message files